IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CASE NO. 3:25-cv-00499-KDB-DCK

| | |
|---|---|
| NAJIBULLAH MAYAR AND MOUHSINA MAYAR, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF STATE, <br><br> Defendant. | **<u>RESPONSE OPPOSING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>** |

COMES NOW Defendant U.S. Department of State in opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("Motion") (Doc. 2) as follows.[1] In short, Plaintiffs, who are proceeding *pro se*, have filed a form motion challenging unreviewable executive action in the field of immigration before any injury has actually occurred.[2]

## <u>INTRODUCTION</u>

In *Trump v. Hawaii*, the Supreme Court upheld the President's authority to use section 212(f) of the Immigration and Nationality Act, 8 U.S.C. § 1182(f) ("INA"), to protect the United States through entry restrictions. 585 U.S. 667 (2018). On January 20, 2025, exercising his authority under 8 U.S.C. §§ 1182(f) and 1185(a), the President issued an Executive Order titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats." 90 Fed. Reg. 8451-53 (Jan. 30, 2025). The Executive Order states that "[i]t is the

---

[1] By filing this response, the United States preserves all defenses set forth in Rule 12(b)(2)-(5), including lack of personal jurisdiction, improper venue, insufficient process, and insufficient service of process. *See* Fed. R. Civ. P. 12(h).

[2] The State Department moves to strike the Complaint and Motion for failing to comply with the Standing Order of this Court entered June 18, 2024, requiring a certification on the use of artificial intelligence. *Mar. 14, 2025 Order, Mawule Tepe v. Clinton L. Corker, et al*., No.3:23-CV-00423, at 2 (W.D.N.C.) (Court authority under Rule 12(f) to strike pleadings); *Thomas v. Meyer*, 2023 WL 2088416, at *6 (E.D. Va. Feb. 17, 2023) (Court authority to strike outside the scope of Rule 12(f)).

1

policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes." *Id.* § 1(a). It directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence to submit a joint report within sixty days (1) "identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries pursuant to [8 U.S.C. § 1182(f)]"; and (2) "identifying how many nationals from those countries have entered or have been admitted into the United States on or since January 20, 2021, and any other information the Secretaries and Attorney General deem relevant to the actions or activities of such nationals since their admission or entry to the United States." *Id.* § 2(b)(i)-(ii).

On June 4, 2025, after receiving the report and recommendation, the President issued Presidential Proclamation 10949 ("Proclamation"). *See* 90 Fed. Reg. 24497-505 (June 10, 2025). The Proclamation fully suspends and limits the entry of nationals from twelve countries found to be deficient with regards to screening and vetting and determined to pose a very high risk to the United States: Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen. Proclamation, § 2. The Proclamation partially suspends and limits the entry of nationals from seven countries who also pose a high level of risk to the United States: Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela. Proclamation, § 3.

## **BACKGROUND**

*Pro se* Plaintiffs Najibullah Mayar and Mouhsina Mayar allege they are lawful permanent residents of the United States who have family members with pending F22 visa applications ("child

of lawful permanent resident") based upon their status as Afghan nationals. (Doc. 2 at 1.) Plaintiffs do not contend the applications have been pending for too long or were decided incorrectly; instead, prior to the adjudication of the visas, Plaintiffs seek to preemptively obtain Court-imposed relief enjoining enforcement of the Proclamation and ordering the State Department to grant the pending visas at the applicants' forthcoming visa interview scheduled for August 12, 2025. (*See* Doc. 2 at 2.)

## I. Presidential Authority Over Foreign Affairs and National Security

Article II of the Constitution vests in the President broad authority over foreign affairs and national security. The President is the "Commander in Chief," and has the "Power, by and with the Advice and Consent of the Senate, to make Treaties, . . . [and to] appoint Ambassadors, other public Ministers and Consuls." U.S. Const., Art. II, § 2. The President also "shall receive Ambassadors and other public Ministers . . . and shall Commission all the Officers of the United States." U.S. Const., Art. II, § 3.

Together, these Article II provisions grant expansive authority to the President over foreign affairs, national security, and immigration. The Supreme Court has long held that "[t]he exclusion of aliens is a fundamental act of sovereignty" that is "inherent in the executive power to control the foreign affairs of a nation." *Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("The exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation."). The President is the "sole organ" and has "very delicate, plenary, and exclusive power" in the "field of international relations." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (discussing "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a

3

basis for its exercise an act of Congress"); *Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113, at *7 (4th Cir. Apr. 7, 2025) (Wilkinson, J., concurring) (noting that the U.S. Constitution "grants substantive authority in foreign affairs both to Congress in Article I and to the Executive in Article II. No such substantive power is granted to the Judiciary").

Although "normally Congress supplies the conditions of the privilege of entry into the United States," "because the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power" without raising delegation concerns. *Knauff*, 338 U.S. at 543. As the Supreme Court has held, Article II confers upon the President expansive authority over foreign affairs, national security, and immigration. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588 (1952); *Knauff*, 338 U.S. at 542; *Curtiss-Wright*, 299 U.S. at 320. Thus, where, as here, "the President acts pursuant to an express or implied authorization of Congress," *i.e.*, 8 U.S.C. §§ 1182(f) and 1185(a)(1), coupled with the President's own Article II powers over foreign affairs and national security, "his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); *see Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (similar).

## II.     The Immigration and Nationality Act

The INA provides the legal framework under which Congress has exercised and delegated its constitutional authority to determine who is permitted to enter the United States, who is permitted to remain in the United States, and for what reasons persons may be admitted to or removed from the United States. "The exclusion of aliens is a fundamental act of sovereignty," and "[t]he right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *Knauff*, 338 U.S. at 542. Central to the Court's

4

consideration of the issues before it is section 212(f) of the INA, 8 U.S.C. § 1182(f), which provides

broad authority to the President to suspend or impose restrictions on the entry of aliens into the

United States:

> **(f) Suspension of entry or imposition of restrictions by President**
> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

"By its terms, § 1182(f) exudes deference to the President in every clause," and "entrusts to the

President the decisions whether and when to suspend entry; . . . whose entry to suspend; . . . for

how long; . . . and on what conditions." *Hawaii*, 585 U.S. at 684. Section 1185(a)(1) of

Title 8 further grants the President broad authority to adopt "reasonable rules, regulations, and

orders" governing the entry of aliens, and the President may make entry "subject to such limitations

and exceptions as [he] may prescribe." 8 U.S.C. § 1185(a)(1). Over at least the past thirty years,

every President has invoked this statutory authority to suspend or impose restrictions on the entry

of certain aliens or classes of aliens.[3] Such exercises have in some instances drawn classifications

based on nationality.[4]

---

[3] *See, e.g.*, Presidential Proclamation 5517 (President Reagan); Exec. Order No. 12,324 (President Reagan); Exec. Order No. 12,807 (President George H.W. Bush); Presidential Proclamation 6958 (President Clinton); Presidential Proclamation 8342 (President George W. Bush); Presidential Proclamation 8693 (President Obama); Exec. Order No. 13,694 (President Obama); Exec. Order No. 13,726 (President Obama).

[4] For example, in 1986, President Reagan (through Presidential Proclamation 5517) invoked section 212(f) to suspend entry of Cuban nationals as immigrants into the United States, subject to certain exceptions. *See Suspension of Cuban Immigration*, 1986 WL 796773 (Aug. 22, 1986). In 1996, President Clinton (through Presidential Proclamation 6958) invoked section 212(f) to suspend entry, subject to certain exceptions, of members of the Government of Sudan, officials of that Government, and members of the Sudanese armed forces as immigrants or nonimmigrants into the United States. *See Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Are Members or Officials of the Sudanese Government or Armed Forces*, 1996 WL 33673860 (Nov. 22, 1996).

## III. The President's Executive Order of January 20, 2025, and Proclamation of June 4, 2025

On January 20, 2025, the President issued an Executive Order titled: "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats." 90 Fed. Reg. 8451-53 (Jan. 30, 2025). The Executive Order stated, "It is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes. *Id.* § 1(a). To accomplish this purpose, the Executive Order directs a number of actions. *See id.* §§ 2-3.

First, Section 2 of the Executive Order directs the Secretary of State (in coordination with other Executive Branch officials) to promptly:

    i.    identify all resources that may be used to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible;

    ii.    determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA for one of its nationals, and to ascertain whether the individual seeking the benefit is who the individual claims to be and that the individual is not a security or public safety threat;

    iii.    re-establish a uniform baseline for screening and vetting standards and procedures, consistent with the uniform baseline that existed on January 19, 2021, that will be used for any alien seeking a visa or immigration benefit of any kind; and

    iv.    vet and screen to the maximum degree possible all aliens who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks.

*Id.* § 2(a)(i)-(iv). The Secretary must, within sixty days of the Executive Order, submit to the President a report (1) "identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries" under 8 U.S.C. § 1182(f)), and (2) "identifying how many nationals from those countries have entered or have been admitted into the United States on or since January 20,

2021, and any other information . . . deem[ed] relevant to the actions or activities of such nationals since their admission or entry to the United States." *Id.* § 2(b)(i)-(ii).

On June 4, 2025, having received the joint report and recommendation and exercising his authority under 8 U.S.C. §§ 1182(f) and 1185(a) and 3 U.S.C. § 301, the President issued the Proclamation. *See* 90 Fed. Reg. 24,497-505. The Proclamation states that "[s]creening and vetting protocols and procedures associated with visa adjudications and other immigration processes play a critical role in implementing" the United States's policy of protecting "its citizens from terrorist attacks and other national security or public-safety threats." Proclamation, § 1(a). The United States must "ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify such aliens before their admission or entry into the United States," and "ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists or other threats to our national security." *Id.*, Preamble.

The Proclamation provides that, in evaluating the Secretary's recommendation, the President considered "foreign policy, national security, and counterterrorism goals"; "various factors, including each country's screening and vetting capabilities, information sharing policies, and country-specific risk factors—including whether each country has a significant terrorist presence within its territory, its visa-overstay rate, and its cooperation with accepting back its removable nationals;" and "different risks posed by aliens admitted on immigrant visas and those admitted on nonimmigrant visas." *Id.* § 1(e). The President also "reviewed these factors and assessed these goals, with a particular focus on crafting country-specific restrictions . . . to

encourage cooperation with the subject countries in recognition of each country's unique circumstances." *Id.*

The Proclamation fully suspends and limits the entry of nationals from twelve countries found to be deficient with regards to screening and vetting and determined to pose a very high risk to the United States: Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen. *Id.* §§ 1(f), 2. The Proclamation partially suspends and limits the entry of nationals from seven countries who also pose a high level of risk to the United States: Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela. *Id.* §§ 1(g), 3. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants. *Id.* §§ 1(f)-(g). The Proclamation makes clear that the suspensions of and limitations on entry pursuant to §§ 2 and 3 apply only to foreign nationals of the designated countries who "are outside the United States" and "do not have a valid visa on the applicable effective date of this proclamation [June 9, 2025]." *Id.* § 4(a).

The countries' designation are not permanent: The Proclamation contains a provision regarding adjustments to and removal of the suspensions and limitations. It directs the Secretary (in consultation with other Executive Branch officials) to "devise a process to assess whether any suspensions and limitations . . . should be continued, terminated, or supplemented," and within 90 days of the date of the Proclamation, and every 180 days thereafter, the Secretary shall submit a report "describing his assessment and recommending whether any suspensions and limitations . . . should be continued, terminated, modified, or supplemented." *Id.* § 5(a). The Proclamation also directs the Secretary to "engage each of the countries identified in sections 2 and 3 of this proclamation on measures that must be taken to comply with United States screening, vetting, immigration, and security requirements." *Id.* § 5(b).

8

Finally, the Proclamation provides that enforcement of its terms shall be in compliance "with all applicable laws and regulations," and that "[n]o immigrant or nonimmigrant visa issued before the applicable effective date of this proclamation shall be revoked." *Id.* § 6(b)-(c). The proclamation also does not apply "to an individual who has been granted asylum by the United States, to a refugee who has already been admitted to the United States, or to an individual granted withholding of removal or protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment (CAT)," and "[n]othing in this proclamation shall be construed to limit the ability of an individual to seek asylum, refugee status, withholding of removal, or protection under the CAT, consistent with the laws of the United States." [5] *Id.* § 6(d).

## STANDARD OF REVIEW

A temporary restraining order ("TRO") is "an extraordinary and drastic remedy . . . never awarded as of right."[6] *Munaf v. Geren*, 128 S. Ct. 2207, 2219 (2008). A party seeking such relief "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that [a TRO] is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). A moving party must satisfy each requirement as articulated. *Pashby v. Delia*, 709 F.3d 307, 320-21 (4th Cir. 2013). Where, as here, the plaintiff seeks injunctive relief that would "deeply intrude[] into the core concerns of the executive branch"—such as foreign affairs and national security—plaintiff must

---

[5] Though not in the Motion, the Complaint alleges that Plaintiffs "fled Afghanistan due to Taliban persecution[,]" with Plaintiff Mouhsina "obtain[ing] U.S. permanent residency in 2022." (Doc. 1 at 2.)

[6] "The standard for granting either a TRO or a preliminary injunction is the same." *Green v. ABC Companies*, 702 F. Supp. 3d 418, 423 n. 1 (W.D.N.C. 2023) (citing *U.S. Dep't of Lab. v. Wolf Run Mining Co.*, 452 F.3d 275, 281 n. 1 (4th Cir. 2006)).

"make an extraordinarily strong showing" as to each element. *Adams v. Vance*, 570 F.2d 950, 954-55 (D.C. Cir. 1978); *see Winter*, 555 U.S. at 32-33.

**ARGUMENT**

Plaintiffs seek "[a] Preliminary Injunction ordering adjudication of the visas without enforcement of Presidential Proclamation 10949," and "[a] Temporary Restraining Order preventing denial of the immigrant visas." (Docs. 2 at 2.) Plaintiffs' requests for injunctive relief and a TRO should be denied. As set forth below, Plaintiffs are unable to demonstrate any of the requirements of the requested "extraordinary and drastic" remedies. *See Munaf*, 128 S. Ct. at 2219. Instead, Plaintiffs have filed a largely conclusory form motion that challenges unreviewable executive action before any injury has actually occurred.

## I. Plaintiffs Unlikely to Succeed on Merits

### A. Plaintiffs Lack Standing.

To establish standing, Plaintiffs bear the burden of showing (1) a concrete and particularized injury-in-fact, either actual or imminent, (2) a causal connection between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The standing inquiry is "especially rigorous" where, as here, the Court faces claims that Congress or the executive branch has acted unconstitutionally. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408-09 (2013) (quotation omitted). "Claims for declaratory or injunctive relief," like those here, also "carry 'a significantly more rigorous burden to establish standing.'" *Matthews v. District of Columbia*, 507 F. Supp. 3, 203 (D.D.C. 2020) (*quoting Swanson Grp. Mfg. LLC v. Jewell,* 790 F.3d 235, 240 (D.C. Cir. 2015)).

Here, Plaintiffs fail to establish standing. First, Plaintiffs have not shown any actual or imminent injury that is causally connected to the enforcement of the Proclamation. The applicants' consular interviews have not yet occurred, as they are scheduled for August 12, 2025. (Doc. 2 at 1.) When the applicants execute their visas at the interviews, the visas could be denied for any number of reasons. For example, a visa could be denied due to the applicant failing to complete the visa application process under INA section 221(g), committing fraud or misrepresentation in the visa process under INA section 212(a)(6)(C)(i), or even being convicted of a crime involving moral turpitude under INA section 212(a)(2)(A)(i)(1). Should the visas be denied for any of these (or other) reasons, Plaintiffs' "injury" would not result from enforcement of the Proclamation. Accordingly, Plaintiffs have not sufficiently alleged any actual or imminent injury that is causally connected to the Proclamation.

Second, Plaintiffs have not established a concrete and particularized injury for the denial of their visas under any other authority, much less one that is redressable. Interestingly, Plaintiffs appear to *only* argue that a denial specifically under the Proclamation would be improper. (*See* Doc. 2 at 1 (seeking relief "to prevent Defendant from denying the [relevant] immigrant visas . . . *under Presidential Proclamation 10949*[,]" and seeking "[a] Preliminary Injunction requiring Defendant to adjudicate the visa applications *without regard to the Proclamation* (emphasis added)); 2 ("Absent [C]ourt intervention, their visas will be denied solely based on their Afghan nationality *under the provisions of Presidential Proclamation 10949*[,]" and noting that "*[t]he Proclamation* is being applied arbitrarily without individualized assessment" (emphasis added)).) Indeed, "Plaintiffs bring this action to prevent irreparable harm resulting from *the enforcement of Presidential Proclamation 10949*[.]" (Doc. 1 at 1 (emphasis added).) Likewise, the Motion's only asserted violations of federal law and (unspecified) constitutional rights are raised specifically in

connection with the Proclamation.[7]  As Plaintiffs explain: "The blanket denial of visas based on nationality violates constitutional protections and the Administrative Procedure Act.  The Proclamation is being applied arbitrarily without individualized assessment."  (Doc. 2 at 2.)

Yet as discussed *supra*, a denial of the visas under the Proclamation is simply one possibility at this stage.  Thus, if the visas are ultimately denied under some basis *other* than the Proclamation, the instant Motion (and the underlying lawsuit) would be moot.[8]  Plaintiffs have therefore failed to cognizably allege any concrete and particularized harm resulting from Proclamation 10949 as it relates to the adjudication of their visas that is scheduled to occur in the future.

At bottom, Plaintiffs challenge the application of the Proclamation where it has not been (and may not be) applied at all.  Plaintiffs have therefore failed to establish standing. The Motion should be denied for this reason alone.

B.    Plaintiffs' Statutory Claims Are Not Justiciable.

Even if Plaintiffs had established standing, and even assuming that each of their visas will be denied at the August 15, 2025 interviews for some yet-to-be-determined reason, their claims would be barred by the "well established" doctrine of consular nonreviewability.  *Sesay v. United States*, 984 F.3d 312, 315 (4th Cir. 2021).  This doctrine "instructs that ordinarily, it is not within

---

[7] The Motion specifies no particular constitutional right at issue.  The Complaint lists "Equal Protection (Fifth Amendment)" and "Procedural Due Process." (Doc. 1 at 2.)  Even if the Court construed the Motion as identifying these authorities, the analysis herein would remain unchanged.

[8] Plaintiffs' request for a TRO to "prevent[] the denial of F22 immigrant visas" appears inextricably intertwined with their repeated references to the Proclamation and stated reason for bringing the lawsuit. (Docs. 1 at 1; 2 at 2.)  But even if the Court construed Plaintiffs' generic and conclusory request for a TRO as seeking some type of relief that is separate from enjoining the enforcement of the Proclamation, it should be noted that Plaintiffs raise no arguments or allegations to support such a TRO, or even identify what laws or rights (if any) would be at risk of being violated if the Court did not "prevent" the visas from being denied.  (*See* Doc. 2 at 2.)

the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien," and requires "highly constrained" judicial deference to executive officials in consular decisions concerning visa applications and other matters. *Id.* at 315-16 (cleaned up). Courts generally may not intervene even where such determination rests on "allegedly erroneous information," or where the "consular official may have erroneously interpreted and applied the INA[,]" or their "decision was not authorized by the INA[.]" *Romero v. Consulate of U.S., Barranquilla, Colombia*, 860 F. Supp. 319, 322-24 (E.D. Va. 1994) (citations omitted) (explaining the "doctrine of nonreviewability of consular officers' visa determination is essentially without exception," otherwise "federal courts would be inundated with claims of disappointed and disgruntled off-shore aliens seeking review of consular officers' denials").

This limitation is rooted in precedent recognizing that "the admission and exclusion of those seeking entry is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Sesay*, 984 F.3d at 316 (quoting *Hawaii*, 138 S. Ct. at 2418)). "The doctrine of nonreviewability of a consul's decision to grant or deny a visa stems from the Supreme Court's confirming that the legislative power of Congress over the admission of aliens is virtually complete." *Ashby v. U.S. Dep't of State*, No. 3:16-CV-00585-FDW-DCK, 2017 WL 1363323, at *3 (W.D.N.C. Apr. 12, 2017), *aff'd*, 697 F. App'x 219 (4th Cir. 2017) (citation and quotation marks omitted). "[T]he power to exclude aliens is 'to be exercised exclusively by the political branches of government,'" and challenging consular visa decisions

"goes to the heart of what is insulated from judicial review by the doctrine of consular nonreviewability."[9]  *Id.* at *6-7 (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972)).

Here, Plaintiffs are not entitled to the requested relief, and thus unlikely to succeed on the merits, because their claims are barred by consular nonreviewability.  Plaintiffs seek to preemptively prevent the denial of their visas.  (*See* Doc. 2 at 2.)  Yet only two possible outcomes exist at a consular interview—the visa is either granted or denied.  *See* 9 FAM 301.2 ("Adjudicating officers are responsible for reviewing each applicant's eligibility at the time of the visa application and adjudicating each application.  Once a visa applicant has properly applied for a visa, you *must* decide whether the applicant is eligible for a visa." (emphasis added)). Plaintiffs' requested relief therefore seeks a Court-imposed mandate that the visas be granted at the upcoming consular interview, regardless of what the consular officer may determine. However, the decision to issue a visa rests solely within the discretion of the consular officer.  Just as cases which clearly seek the issuance of a new visa or scheduling of a new interview should be dismissed as non-reviewable, so too should the instant preemptive request for issuance of Plaintiffs' visas be denied.  *Cf. Ramirez v. Clinton*, No. 5:12-CV-252-BR, 2013 WL 227732, at *3 (E.D.N.C. Jan. 22, 2013), *aff'd sub nom. Rodriguez v. Kerry*, 537 F. App'x 209 (4th Cir. 2013) (unpublished).

To the extent the Court construes Plaintiffs' Motion as alleging that the Executive Branch exceeded its statutory authority under Section 1182(f) (which is not cited in either the Motion or Complaint), consular nonreviewability would likewise preclude such claims.  "For more than a

_____

[9] To the extent Plaintiffs have raised any cognizable statutory or non-constitutional challenges not otherwise covered herein, consular nonreviewability would bar such challenges.  Similarly, to the extent Plaintiffs challenge the legality of the Proclamation, as discussed, the Supreme Court of the United States has held that a prior Presidential Proclamation restricting the travel of foreign nationals was a valid exercise of the broad authority Congress granted the President in § 1182(f).  *Hawaii*, 585 U.S. at 683-84.

century, this Court has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Hawaii*, 585 U.S. at 702 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977))).  The Supreme Court recently explained this principle of consular nonreviewability:

> Congress may delegate to executive officials the discretionary authority to admit noncitizens immune from judicial inquiry or interference.  When it does so, the action of an executive officer to admit or to exclude an alien is final and conclusive.  The Judicial Branch has no role to play unless expressly authorized by law.  The [INA] does not authorize judicial review of a consular officer's denial of a visa; thus, as a rule, the federal courts cannot review those decisions.  This principle is known as the doctrine of consular nonreviewability.

*Dept. of State v. Muñoz*, 602 U.S. 899, 907-08 (2024) (cleaned up).  The Supreme Court has permitted extremely limited review only where U.S. citizens claim that a visa denial burdens their own constitutional rights.[10]  *See id.* at 908.

Congress "may, if it sees fit . . . authorize the courts to" review decisions to exclude aliens.  *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892) (citation omitted).  But Congress has not authorized review of a denial of a visa, and in fact has expressly rejected such a cause of action.  *See* 6 U.S.C. § 236(f); *Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999) (denial of visa to alien abroad "is not subject to judicial review . . . unless Congress says otherwise").  Accordingly, with respect to non-constitutional claims, it is a fundamental separation-of-powers principle, long recognized by courts, that the political branches' decision to exclude aliens abroad is not judicially reviewable.

There is no basis to conclude that any statutory challenges to visa adjudications that Plaintiffs may have raised are reviewable.  Outside of the narrow exception for certain

---

[10] Plaintiffs have not shown a likelihood of success on any constitutional challenge as discussed below.

constitutional claims, because noncitizens abroad have no "claim of right" to enter the United States and exclusion is "a fundamental act of sovereignty" by the political branches, courts may not review decisions to exclude noncitizens "unless expressly authorized by law." *Knauff*, 338 U.S. at 542-43. Congress has made clear that there is no cause of action to review a visa denial, and the INA, which sets forth a comprehensive framework for review of removal orders, authorizes judicial review only for individuals subject to immigration enforcement *within* the United States, *see* 8 U.S.C. § 1252. The only review permitted of a visa denial abroad is limited to considering whether a facially legitimate and bona fide reason was cited for the refusal in cases where the visa refusal burdens the constitutional rights of a United States citizen. *See Kerry v. Din*, 576 U.S. 86, 101-04 (2015); *Muñoz*, 602 U.S. at 908.

But even if Plaintiffs' claims were judicially reviewable, the Proclamation is a valid exercise of the broad authority Congress granted the President in § 1182(f). Section 1182(f) provides that "[w]henever the President finds that the entry of . . . any class of aliens into the United States would be detrimental to the interests of the United States, he may . . . suspend entry of . . . any class of aliens . . . or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f); *see also id.* § 1185(a)(1). Section 1182(f) "exudes deference to the President in every clause," and in that statute Congress "entrusts to the President the decisions whether and when to suspend entry," "whose entry to suspend," "for how long," and "on what conditions." *Hawaii*, 585 U.S. at 684.

Here, the President lawfully exercised this authority after "finding that unrestricted entry of nationals from the named countries would be detrimental to the interests of the United States." 90 Fed. Reg. 24,499; *see also Hawaii*, 585 U.S. at 685 (explaining that "the sole prerequisite" to this "comprehensive delegation" "set forth in § 1182(f) is that the President 'find[]' that entry of

the covered aliens 'would be detrimental to the interests of the United States'"). The President explains through the Proclamation that "[t]he restrictions and limitations imposed by this proclamation are, in [his] judgment, necessary to prevent the entry or admission of foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States." 90 Fed. Reg. 24,499. The Proclamation further explains that "[t]he restrictions and limitations imposed by this proclamation are necessary to garner cooperation from foreign governments, enforce our immigration laws, and advance other important foreign policy, national security, and counterterrorism objectives." *Id.*

Importantly, *Hawaii* made clear that Plaintiffs cannot succeed on an attack on the sufficiency of the findings in a Presidential Proclamation. 585 U.S. at 686 (finding "questionable" argument that President must "explain [his] finding[s]"). The Supreme Court also emphasized that, "even assuming that some form of review is appropriate," the proclamation at issue in that case (like the one here) contained more detailed findings than prior proclamations. *Id.* (citing Proclamation No. 6958, where President Clinton explained in only "one sentence why suspending entry of members of the Sudanese government and armed forces" was in the interests of the United States, and Proclamation No. 4865, where President Reagan suspended entry of certain "undocumented aliens from the high seas" with a five-sentence explanation). A more "searching inquiry" into the findings "is inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere." *Id.* Plaintiffs thus cannot challenge the Proclamation based on their "perception of its effectiveness and wisdom," and courts "cannot substitute [their] own assessment for the Executive's predictive judgments." *Id.* at 708.

In short, Plaintiff's requested relief should be denied based upon the non-justiciability of any underlying non-constitutional or statutory claims.

C.   Plaintiffs' Constitutional Claims Fail.

To the extent the Motion is construed as raising a theory for relief under the Fifth Amendment, it must fail. Plaintiffs do not have a due process interest in the State Department's adjudication of their family members' visas as a matter of law. *See Raihanoune*, 2025 WL 510235, at *3 ("Plaintiff does not have a due process interest in the adjudication of her husband's visa application."); *Muñoz*, 602 U.S. at 909 ("[A] citizen does not have a fundamental liberty interest in her noncitizen spouse being admitted to the country."). Nor do Plaintiffs have any substantive or procedural due process right implicated in having their family members' visas adjudicated. *Raihanoune*, 2025 WL 510235, at *4 ("If the burden of not living with one's spouse cannot compel *admittance* to the country, how can that same burden suffice to compel adjudication[?] It cannot." (emphasis in original)). Plaintiffs' Fifth Amendment claim, should any such claim be construed in the Motion, should therefore be dismissed.[11]  *See Ishaq v. Schofer*, No. 8:24-CV-00207-TJS, 2024 WL 3729107, at *8 (D. Md. Aug. 8, 2024) (no Fifth Amendment Due Process property right in an immigrant visa or the procedures to obtain it); *cf. Aslam v. Heller*, No. 1:23CV971, 2024 WL 3535389, at *2 n.3 (M.D.N.C. July 23, 2024) (constitutional claim required dismissal where it was premised on statutory claims that had been dismissed).

D.   Plaintiffs' Cannot Raise an APA Claim Where the President is Not an Agency and There is No Identified Reviewable Final Agency Action.

To the extent Plaintiffs seek judicial review of a Presidential Proclamation under the APA, "an APA challenge to an agency's implementation of an executive order (or other presidential

---

[11] Similarly, any potential Equal Protection claim (should one be construed) would fail. *See Sarsour v. Trump*, 245 F. Supp. 3d 719, 740 (E.D. Va. 2017) (finding plaintiffs failed to show likely success on the merits when challenging executive order imposing travel restriction on certain countries based upon, *inter alia*, the non-permanent nature of the executive order and stated justifications amounting to a rational security basis.

directive) is not permissible prior to some independent, concrete action by the agency."[12]  *See Serv. Emps. Int'l Union Loc. 200 United v. Trump*, 420 F. Supp. 3d 65, 75 (W.D.N.Y. 2019) (citation omitted).

Likewise, no APA claim is otherwise available because Plaintiffs have not identified any final agency action that has occurred distinct from the Proclamation.  *See* 5 U.S.C. § 704.  *See also Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18, 28-29 (D.D.C. 2001), *aff'd,* 306 F.3d 1138 (D.C. Cir. 2002) (holding APA review does not extend to agency action "merely carrying out directives of the President" for the same reasons "APA does not apply to presidential action," since "the action in question is an extension of the President's action"); *Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 395 (D.C. Cir. 2013) (recognizing that "interpretative rules or statements of policy generally do not qualify" as final agency action and are not subject to judicial review under the APA "because they are not finally determinative of . . . issues or rights").

Even if APA review were generally available for Presidential actions, it still would be precluded here.  The APA's cause of action expressly leaves intact "other limitations on judicial review," 5 U.S.C. § 702(1), which includes the longstanding limitation on review of Executive decisions to deny entry to aliens, *see Saavedra Bruno v. Albright*, 197 F.3d 1153, 1160 (D.C. Cir. 1999); *Adeyemo v. Kerry*, No. CIV.A. DKC 12-0874, 2013 WL 498169, at *2 (D. Md. Feb. 7, 2013) (compiling cases), *aff'd*, 546 F. App'x 187 (4th Cir. 2013).  The APA also does not permit review of actions "committed to agency discretion by law."  5 U.S.C. § 701(a)(2); *See Hawaii*, 585 U.S. at 684 ("By its terms, § 1182(f) exudes deference to the President.").

---

[12] Similarly, it does not appear that Plaintiffs are challenging that the Proclamation is a valid exercise of the President's authority under §§ 1182(f) and 1185(a).

A Proclamation under 8 U.S.C. §§ 1182(f) and 1185(a) is just such a discretionary action because these statutory provisions provide broad discretionary authority to the President to suspend by proclamation the entry of any class of aliens whenever he finds their entry would be detrimental to the United States. *See also Webster v. Doe*, 486 U.S. 592, 600 (1998) (holding that similar statutory language that "exudes deference" to the Executive cannot be reviewed under the APA because it "foreclose[s] the application of any meaningful judicial standard of review"); *Sale*, 509 U.S. at 187 (discussing broad authority under § 1182(f)); *Abourezk v. Reagan*, 785 F.2d 1043, 1049, n.2 (D.C. Cir. 1986) (describing the President's "sweeping proclamation power").

E.     There is No Other Legal Authority to Sustain Plaintiffs' Motion.

Of what potentially remains, Plaintiffs have no cause of action under either the APA or the Proclamation. First, the APA applies only to those "adversely affected or aggrieved by agency action within the meaning of a relevant *statute*"—*i.e.*, persons to whom Congress intended to afford privately enforceable rights. 5 U.S.C. § 702 (emphasis added); *see Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177–78 (2011). But Plaintiffs have no privately enforceable rights in this context. The INA permits the President to suspend entry of aliens entirely and to impose restrictions based on his determination of the interests of the United States. Plaintiffs thus cannot allege that Defendants have violated the INA or any other statute; their claims appear limited to purported violations of some rights or laws caused by the Proclamation itself—which they are unable to show.

The Proclamation forecloses judicial review. This is consistent with the general principle that "there is no private right of action to enforce obligations imposed on executive branch officials by executive orders." *See Chai v. Carroll*, 48 F.3d 1331, 1338 (4th Cir. 1995) (quotations and citation omitted). Unlike statutes and regulations, which carry "the force and effect of law,"

proclamations are management tools for implementing the President's policies, not legally binding

documents that may be enforced against the Executive Branch. *See United States ex rel. Accardi*

*v. Shaughnessy*, 347 U.S. 260, 265 (1954).

Moreover, the only statutes that the Proclamation does invoke are 8 U.S.C. § 1182(f) and

§ 1185(a), which "vest[] the President with ample power to impose entry restrictions" and "exude[]

deference to the President in every clause." *Hawaii*, 585 U.S. at 684 (quotation marks omitted).

Section 1182(f), in relevant part, provides the following:

> Whenever the President finds that the entry of any aliens or any class of aliens into the
> United States would be detrimental to the interests of the United States, he may by
> proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens
> or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any
> restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). By its terms, this provision grants the President broad authority over the

administration of the immigration system and confirms his discretion. *See, e.g.*, *Sale*, 509 U.S. at

187 ("It is perfectly clear that 8 U.S.C. § 1182(f) . . . grants the President ample power to establish

a naval blockade that would simply deny illegal Haitian migrants the ability to disembark on our

shores.").

Section 1185(a) likewise confirms the breadth of the President's authority:

> Unless otherwise ordered by the President, it shall be unlawful … for any alien to depart
> reasonable rules, regulations, and orders, and subject to such limitations and exceptions as
> the President may prescribe[.]

8 U.S.C. § 1185(a)(1). That statute does not require any predicate findings at all, but simply gives

the President the authority to restrict entry to the United States according to "such limitations and

exceptions as the President may prescribe." *Id.*; *see Haig v. Agee*, 453 U.S. 280, 297 (1981)

(construing similar language in § 1185(b)—which governs United States citizens—as "le[aving]

the power to make exceptions exclusively in the hands of the Executive"); *Allende v. Shultz*, 845

F.2d 1111, 1118 & n.13 (1st Cir. 1988). As with § 1182(f), the history of § 1185(a) confirms the broad discretion accorded to the President over immigration matters: the statute was originally enacted in 1918 as a wartime measure authorizing restrictions if the President found that "the public safety require[d]" them. 40 Stat. 559 (1918). In 1978, Congress broadened the statute even further by removing not only the wartime requirement but also the requirement for *any* predicate finding for restrictions the President might order. *See* Pub. L. No. 95-426, sec. 707(a), 92 Stat. 963, 992-93 (1978).

In short, based on their plain text, these statutes provide no basis for judicial second-guessing of the President's determinations about what restrictions to "prescribe" or what restrictions and limitations are necessary to avoid "detriment[] to the interests of the United States." Proclamation, Preamble. Congress specifically entrusted those matters to the President, and 'the power to *expel or exclude* aliens as a fundamental sovereign attribute exercised" by the political branches remains "largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (emphasis added). In fact, "[t]he right to do so stems not alone from legislative power but is *inherent* in the executive power to control the foreign affairs of the nation." *Knauff*, 338 U.S. at 542 (emphasis added); *see Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (holding that the "historical gloss on the executive Power vested in Article II of the Constitution has recognized the President's vast share of responsibility for the conduct of our foreign relations" (internal quotation marks omitted)).

The Proclamation is a valid exercise of the President's authority under §§ 1182(f) and 1185(a), and is not subject to review. *Cf. Hawaii*, 585 U.S. at 683 (assuming without deciding that plaintiffs' statutory claims were reviewable). To the extent Plaintiffs' requested relief is premised

on the Executive Branch's actions exceeding its statutory authority (if any), it should therefore be denied.

Plaintiffs have thus failed to demonstrate a likelihood of success on the merits at all, much less one to warrant the extraordinary relief of an injunction or TRO. *Cf. CASA, Inc. v. Noem*, 8:25-cv-01484-TDC, Doc. 12 (4th Cir. July 21, 2025) (declining in another immigration context to impose "extraordinary remedy" of enjoining postponement of agency action even where, unlike here, a plausible claim for relief existed).

## II. Balance of Equities Does Not Support Relief

Turning to the remaining *Winter* factors—whether Plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief; the balance of equities tips in their favor; and an injunction is in the public interest—Plaintiffs have likewise failed to carry their burden to obtain the extraordinary relief they seek. 555 U.S. at 20.

For the second factor, Plaintiffs allege that "permanent separation from their children and siblings" amounts to irreparable harm. (Doc. 2 at 2.) However, as discussed above, the Proclamation is not permanent. It directs the Secretary (in consultation with other Executive Branch officials) to "devise a process to assess whether any suspensions and limitations . . . should be continued, terminated, or supplemented," and within 90 days of the date of the Proclamation, and every 180 days thereafter, the Secretary shall submit a report "describing his assessment and recommending whether any suspensions and limitations . . . should be continued, terminated, modified, or supplemented." Proclamation, § 5(a). Plaintiffs' allegations of a "permanent separation" simply do not amount to "more than just the 'possibility' of irreparable harm," which is insufficient to warrant the Motion's requested relief. *See Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).

By contrast, the United States suffers irreparable harm when its policies are enjoined. *See also Maryland v. King*, 567 U.S. 1301, 1303 (2012) "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."); *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562 (2025) (citing *King* for this proposition); *Miranda v. Garland*, 34 F.4th 338, 365–66 (4th Cir. 2022) ("The enforcement of our immigration laws is the government's sovereign prerogative[.]" (citation and internal marks omitted)).

Lastly, the final two *Winter* factors "merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365-66 (4th Cir. 2022) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Courts must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982).

For the third and fourth factors (balance of equities and public interest), Plaintiffs simply argue that they "suffer substantial harm from visa denial, while the government faces no meaningful prejudice by processing valid applications" and it would be "in the public interest to uphold the rule of law, avoid arbitrary government action, and preserve family unity." (Doc. 2 at 2.) Plaintiffs do not specify what substantial harms they would face should the visas be denied. To the extent they rely on permanent family separation, Plaintiffs have not shown such separation would be permanent for the reasons discussed.

Further, the Government and the public share an interest in ensuring adherence to processes not only established by Congress, but also that power which "is inherent in the executive power to control the foreign affairs of the nation." *Knauff*, 338 U.S. at 542. Indeed, "[t]he exclusion of aliens is a fundamental act of sovereignty[.]" *Id.* The requested relief would amount to "an improper intrusion by a federal court into the workings of a coordinate branch of the

Government[,]" *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06 (1993), especially where, as here, such relief would effectively overrule the State Department's forthcoming judgment in an area that implicates "a fundamental sovereign attribute exercised by the Government's political departments[, which are] largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 787 (1977) (citations and internal marks omitted).

Additionally, "the Government's interest in combating terrorism is an urgent objective of the highest order." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). This is particularly true where, as here, the requested relief would be contrary to the national interests and justifications identified in the Proclamation when viewed through the broad deference granted to the Executive branch in making such determinations, as discussed *supra*. *See Sarsour*, 245 F. Supp. 3d at 742. As a consequence, Plaintiffs are unable to show that the balance of the equities tip in their favor or it would be in the public interest to grant the requested relief.

## CONCLUSION

For the reasons set forth above, the Court should deny Plaintiffs' Motion for Preliminary Injunction and Temporary Restraining Order. (Doc. 2.)

This the 24th day of July, 2025.

**RUSS FERGUSON**
UNITED STATES ATTORNEY

**s/Jonathan M. Warren**
JONATHAN M. WARREN
Assistant United States Attorney
N.C. Bar No. 53653
227 West Trade Street
Suite 1650, Carillon Building
Charlotte, NC 28202
Tel: 704-344-0182
Email: Jonathan.Warren@usdoj.gov

## **CERTIFICATION**

Pursuant to the Standing Order of this Court entered June 18, 2024 and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies:

1.     No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2.     Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 24th day of July, 2025.

**s/Jonathan M. Warren**
JONATHAN M. WARREN
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that on the 24th day of July, 2025, the foregoing was served on plaintiff by mailing a copy thereof, first class mail, postage prepaid, and properly addressed as follows:

Najibullah Mayar
Mouhsina Mayar
8006 Ramsburg Drive
Charlotte, NC  28269

**s/Jonathan M. Warren**
JONATHAN M. WARREN
Assistant United States Attorney